IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2005 Session

## STATE OF TENNESSEE v. TERRANCE WILKINS and CHRISTOPHER HUGHLETT

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-11193-94      Joseph B. Dailey, Judge**

---

**No. W2003-03085-CCA-R3-CD  - Filed February 8, 2006**

---

The defendants, Terrance Wilkins and Christopher Hughlett, were convicted, respectively, of two counts of robbery and two counts of aggravated robbery. Wilkins was sentenced to consecutive terms of four years for each robbery conviction; and Hughlett was sentenced to consecutive terms of eleven years for each aggravated robbery conviction. On appeal, Wilkins argues that this court should consider all of the claims raised by his motion for new trial, even though it was untimely; that the trial court erred in imposing consecutive sentences; and that the evidence is insufficient to sustain the verdicts. Hughlett argues on appeal that the testimony of a codefendant was not sufficiently corroborated; that the evidence is insufficient to support his convictions; and that the trial court erred in sentencing. Following our review, we affirm the judgments of conviction of both defendants but modify Wilkins' sentences to be served concurrently, rather than consecutively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and Michael Johnson, Assistant Public Defender (at trial), for the appellant, Terrance Wilkins.
Charles Waldman, Memphis, Tennessee, for the appellant, Christopher Hughlett.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Ray Lepone, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Officer Jeffery Turner of the Memphis Police Department testified that on December 6, 1998, he responded to a robbery call, going to 988 Mississippi Boulevard, where he was flagged down by the two victims, Brian Graham and James Lewis. He testified as to what the victims told him about the robberies and beatings:

> I arrived on Mississippi Street, and the two victims, they were identified as Brian Graham and James Lewis, flagged me down and advised they had been robbed. Mr. Graham had a deep gash in the top of his head, and it was bleeding down the side of his cheek, and Mr. Lewis had a big goose egg on the very top of his head – swollen from being struck.

> They advised me that they had met individuals on a gas station lot on Elvis Presley. And they, themselves were a rap group trying to sell their CD's. And the suspects were saying that they were a rap group trying to sell their CD's. They exchanged CD's, and . . . the suspects advised that they could help them sell their CD's around town; and if they followed them, they would take them to locations where they could sell their CD's.

> The victims followed the suspects to 967 Porter. The suspects, all four, exited their vehicle – a '97 Nissan Path Finder, green color. As the driver stepped out of the Mercedes, two of the suspects struck the victim, Graham, over his head and threw him to the ground. Two of the other suspects then pulled out Victim No. 2, Mr. Lewis, and struck him on top of his head with a 380 – a[] semi-automatic pistol.

> They forced the two victims to the rear of 967 Porter, which is an apartment complex. They forced them to the ground, took their jewelry and cash, and advised them that they had to lay there for fifteen minutes, and if they called the police, they would come back and kill them.

Officer Damien Kelly, of the Memphis Police Department, testified that he had investigated the robbery of the two victims. He provided a list of members of the South Side Soldiers rap group to other officers investigating the case.

Lieutenant Anthony Craig, of the Memphis Police Department, testified that he had shown both of the victims a spread of photographs, which included those of both defendants. He said that Graham identified the defendant, Christopher Hughlett, and a codefendant, Mario Colbert.

Brian Graham, one of the victims and a resident of Florida, testified that on December 6, 1998, he and James Lewis had been in Memphis "promoting some music," consisting of their

"selling CD's, putting up posters, . . . getting [their] promotional stuff just to get [their] music out there – working toward a distribution deal with a major company." He said they had stopped at a Texaco station in Memphis and "heard some music playing in a green Nissan Path Finder [sic]" which Graham approached to try and sell some of his CDs. A man in the vehicle told Graham that he was a member of a rap group called the South Side Soldiers and offered to trade one of his CDs for one of Graham's. He told Graham he could show him where he could sell some of his CDs. The man with whom Graham was talking called another person, who arrived in a white Pathfinder and said that he also was a member of the South Side Soldiers. Graham and Lewis followed the green Pathfinder in their vehicle and, as they were traveling, the driver of the Pathfinder picked up other individuals. After both vehicles had stopped at a location on Porter Street, there were "four guns pointed at [the victims] all of a sudden." The men threw the victims "down on the ground, and they just basically took everything out of [the victims'] pockets." They took Graham's jewelry, hit him in the head "three or four" times, and forced him to show where other valuables were in his car. He said that all four men had guns and took a fifth one that Graham kept under the seat in his vehicle. Graham identified the defendants, Wilkins and Hughlett, as two of the robbers. Graham said that defendant Hughlett hit him "in the head with the gun three or four times." He tried to block one of the blows and "messed up" his elbow. As Graham tried to block another of the blows, his fingernail was torn off, resulting in his getting ten stitches. Graham said that defendant Wilkins and another man had Lewis "down on the ground, and one of them kicked him in the face, and another one hit him in the head also." While Lewis was being attacked, Graham "was down on the ground with [his] face flat on the concrete with a gun to [his] back and a gun to [his] head, and it . . . happened so fast." Graham said that defendant Hughlett and the other man went through his pockets, and one of them "pressed" a gun into his spine. Graham said that defendant Hughlett was one of the men who assaulted him and Wilkins was one of those who assaulted Lewis. He said the robbers took "a little money" and "a big herringbone necklace" from Lewis. After one of the robbers told the victims they had "five minutes to live," the victims started running and heard two gunshots. They ran through an alley and across another street where they waited until they thought the robbers were gone before calling 9-1-1 from a pay phone. After the police arrived, the victims returned to the robbery scene and discovered that Graham's vehicle had been taken. Graham said the police recovered his car about three weeks later.

The charges against codefendant Toric Lyles were dismissed prior to the trial. He was called by the State as a witness and testified that police officers had coerced him into giving a statement. He said that they had thrown water in his face, slapped him, and kept him handcuffed to a chair. Lyles acknowledged that he had given the following statement as to the robbery:

I was at the Texaco on Elvis Presley and Winchester pumping gas into my Path Finder when two guys came up and asked me if I wanted to buy a rap CD. I told them that I didn't want to buy it, but my partner might be interested in it. The two guys walked off and asked me if I knew where some weed was. I told them my partner might know where some was, and they asked me for some whiskey too. I called [Colbert] on his cell phone. I told [Colbert] that I had some rappers that

wanted to talk to him. [Colbert] said that he was on his way up to where we was [sic] to talk to them.

[Colbert] pulled up in a rented Monte Carlo or Malibu, one – it was cream. Delinis (phonetic) was in the car with [Colbert] and her two kids. [Colbert] got out and walked up to me and the two dudes [the victims]. [Colbert] and the two dudes talked about the music, the tapes, and CDs. Me and [Colbert] got into my truck, and the two dudes followed us in the Mercedes. Delinis drove off in [Colbert]'s car. Me and [Colbert] led the two dudes to Mr. Hill's house on Porter Street. He's the bootlegger. The taller dude and [Colbert] went into Mr. Hill's window and bought two pints of Tennessee Whiskey. Then we led the two dudes back on the top of Porter Street and Walker. We all got out, started drinking and smoking weed. I didn't drink no whiskey. I don't drink.

[The defendants], Voleny, and Tinker were already there when we pulled up. [Colbert] turned to [the defendants] and whispered something. [Defendant Hughlett] pulled out his twenty-five and racked it. [Colbert] told the two dudes to get on the ground. The little short dude laid down.

[Colbert] had the tall dude by the collar with his nine millimeter on him.

[Colbert] told him to just stand there and not to move.

[Defendant Hughlett] patted down the short dude on the ground and took a revolver from the short dude's side.

[The defendants] started kicking the short dude because he had a gun.

Me and Tinker started circling the Mercedes and then searched it.

[Colbert] pulled the tall dude over to the car. [Colbert] asked the tall dude where his money was at in the car. The tall dude pointed in the glove box. I opened the glove, and there was a .380 in the holster. I tried to get it, but it was stuck.

[Colbert] handed me his nine millimeter, and I held it on the tall dude.

[Colbert] got the .380 out.

[Defendant Hughlett] told the dudes to run, and they ran through the apartments on Porter Street. As the two guys was [sic] running, [Defendant Hughlett] shot two times in the air to make them run faster.

-4-

After the two dudes ran off, Tinker drove the car off and parked it on Lemo[y]ne Owens College lot.

Me and [Colbert] got in my truck. [Colbert] drove down to my house on Graves. Delinis was waiting on us. [Colbert] had brought the dude's briefcase thinking there was a lot of money in it. He took it with him, and him and Delinis left.

Special Agent Ford K. Wilson of the Federal Bureau of Investigation testified that Toric Lyles had named defendant Wilkins as one of those involved in the robbery. The identity of the other participants already were known to Agent Wilson. He said that Lyles's statement was consistent with those of the two victims.

The only defense witness was the defendant, Christopher Hughlett, who said that he was not involved in the offenses.

## ANALYSIS

On appeal, Wilkins argues that the evidence is insufficient to support his convictions and that the trial court erred in ordering consecutive sentencing. Further, he argues that this court should consider these issues even though his motion for new trial was untimely. Hughlett argues that the evidence is insufficient to support his convictions, that the testimony of Toric Lyles was not sufficiently corroborated, and that the trial court erred in sentencing. The State disagrees with each of these arguments.

### I. Wilkins' Untimely Motion for New Trial

The State argues that the defendant has waived consideration of his issues on appeal because he untimely filed his motion for a new trial and his notice of appeal. Tennessee Rule of Criminal Procedure 33(b) provides that a motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." This provision is mandatory, and the time for filing may not be extended. See Tenn. R. Crim. P. 45(b); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). The thirty-day provision is jurisdictional, and an untimely motion is a nullity. State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The untimely filing of a motion for new trial deprives the defendant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. Martin, 940 S.W.2d at 569. Unlike the action this court may take following the untimely filing of the notice of appeal, we do not have the authority to waive the untimely filing of a motion for new trial. See Tenn. R. App. P. 4(a); State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). However, in our discretion, we may take notice of plain error which affects a substantial right of the defendant where it may be necessary to do substantial justice. Tenn. R. Crim. P. 52(b); State v. Johnson, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998).

On appeal, the defendant raises the two claims which may be considered even though not raised in a timely motion for new trial, that the evidence is insufficient to sustain the convictions and

the trial court erred in sentencing. Accordingly, we will consider the issues which Wilkins raises on appeal.

## II. Sufficiency of the Evidence

Defendant Wilkins was convicted of two counts of robbery, the elements of which are set out in Tennessee Code Annotated section 39-13-401(a): "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Defendant Hughlett was convicted of two counts of aggravated robbery, the elements of which are set out in Tennessee Code Annotated sections 39-13-401(a) and 39-13-402(a): "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon or [w]here the victim suffers serious bodily injury." Both defendants claim that the evidence is insufficient to sustain their convictions.

In considering these claims, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the victim, Brian Graham, testified that defendant Hughlett hit him on the head with a pistol and took his jewelry and money. Additionally, he said his car had been taken and identified defendant Wilkins as the robber who struck the victim, James Lewis, and took a necklace and money from him. In his statement, Lyles said that both defendants had kicked "the short [victim]" as he was on the ground. This evidence is sufficient for a reasonable jury to conclude that the defendants committed the offenses of which they were convicted.

### III. Corroboration of Lyles's Statement

Defendant Hughlett argues on appeal that the statement of Lyles implicating him in the offenses was not sufficiently corroborated. This claim discounts the testimony of the victim, Brian Graham, which the jury obviously believed, that one of the men who attacked and robbed him was Hughlett and that the four robbers were acting in concert.

Our supreme court explained in State v. Shaw, 37 S.W.3d 900 (Tenn. 2001), the evidence required to sustain the confession of another linking the defendant to the crime charged:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Id. at 903 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)).

In this matter, the statement of Lyles implicating Hughlett was corroborated by Graham's in-court identification of Hughlett as one of the robbers. Accordingly, we conclude that this claim is without merit.

### IV. Sentencing

Both defendants argue that the trial court erred in imposing consecutive sentencing. Defendant Hughlett argues, as well, that the trial court erred in imposing sentences of eleven years for each of his convictions; and we first will consider this claim.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial

court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

As to the sentencing of defendant Hughlett, the trial court conducted an extensive sentencing hearing, discussing with counsel in detail the defendant's presentence report. According to the report, Hughlett claimed that he had not been involved in the offenses. His prior convictions were as follows: March 12, 2002, theft up to $500, $600 fine; January 4, 2000, violation of the open container law, $50 fine; January 4, 2000, obstructing a highway or other passageway, $50 fine; June 16, 1999, theft up to $500, $250 fine; and October 3, 1996, possession of drugs, one day confinement, $250 fine. According to the report, Hughlett said that he had been treated for depression from November 3, 1995, to April 17, 1996, when he was "determined to be mentally disabled." He said that he had dropped out of school in 1993, when he was in the tenth grade, and that he had never been employed. Records from the University of Tennessee Health Science Center stated that when Hughlett was discharged from partial hospitalization on November 3, 1995, he was suffering from "depression which [had] a paranoid, delusional quality to it." In response to a question from the court, Hughlett's counsel advised that Hughlett had stopped taking his prescribed medication.

In sentencing Hughlett, the trial court applied enhancement factor (1), based upon his prior convictions, and factor (10), that the defendant had no hesitation to commit the crimes. See Tenn. Code Ann. § 40-35-114(1), (10) (2003). Considering the mitigation factors which Hughlett argued should be applied, the court noted that Hughlett's medical records showed he had been treated for mental health problems from 1995 to 1997 and that, according to those records, he had smoked

"marijuana several times a day, every day, since the age of sixteen," and had smoked crack cocaine as well. The court explained that a defendant would be credited with a mitigating factor if the defendant, "once diagnosed, aggressively pursues a program of addressing those problems . . . staying away from drugs and alcohol, looking for work." As to each of Hughlett's aggravated robbery convictions, the trial court sentenced him to eleven years, with the range being eight to twelve years for a Range I offender convicted of a Class B felony. See Tenn. Code Ann. § 40-35-112(a)(2).

On appeal, Hughlett argues that the trial court erred in fixing each sentence at eleven years. First, he claims that the court should not have considered the convictions which he had between the commission of the crimes which are the basis for this appeal and his sentencing for them. However, as explained in State v. Wayne Michael Fuller, No. E1999-01676-CCA-R3-CD, 2000 WL 1156625, at *3 (Tenn. Crim. App. Aug. 16, 2000), "[t]hat argument has been advanced and rejected numerous times." Thus, we conclude that enhancement factor (1) was applicable. He does not assert that the trial court erred in applying factor (10) but argues that the court gave enhancement factors (1) and (10) undue weight and "completely disregard[ed]" the evidence of his mental disorder. In fact, as we have set out, the court considered the defendant's diagnosed mental problem but concluded it was not a mitigating factor because, prior to the crimes, the defendant had discontinued his medical treatment, had ceased taking his medication at some point, and had been a regular user of marijuana and cocaine for a period of years. The weight given to an enhancement factor is left to the discretion of the trial court, assuming the court complied with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). We conclude that the trial court did not err in applying enhancement factor (10) or in not considering the defendant's mental problem as a mitigating factor. Further, we conclude that the record supports the sentences of eleven years for the defendant's convictions of aggravated robbery.

As for the consecutive sentencing of Hughlett, the trial court found that Tennessee Code Annotated section 40-35-115(b)(4) was applicable: "The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Criterion (4) has been specifically discussed by our supreme court in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), where the court held:

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

Id. at 939. This requirement of additional findings has been recently limited to criterion (4). See State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In concluding that Hughlett should serve his sentences consecutively, the trial court discussed at length the letter written by the victim, Brian Graham, explaining the continuing physical and

psychological effects of the crimes on him. The court reviewed the severity of the offenses, with the victims held at gunpoint, "pistol-whipped, . . . told to run for their lives, . . . then to hear shots fired, [and] not knowing what was coming next, has traumatized, certainly, Mr. Graham and has affected him for the rest of his life." We conclude that the record supports the trial court's findings that defendant Hughlett's sentences should be served consecutively.

As to defendant Wilkins, the trial court ordered that his two sentences of four years be served consecutively, finding that "the majority of his livelihood was made from criminal conduct" and explaining its reasoning:

> You have a man who is expelled from school in the ninth grade after his seventh or eighth board suspension. He is expelled from school not because he had a 65 IQ and was incapable of doing the work; he was expelled from school with an 85 IQ fully capable of doing the work; but for other reasons that aren't specified in the letter, he gets kicked out of school in the ninth grade; and not once, but twice, as a juvenile, is convicted of selling drugs – offenses which, if an adult, would have been felonies.

> He graduates on to his adult record and is again convicted of selling drugs as an adult and is arrested on numerous occasions and convicted of possession of drugs; and, in fact, is arrested two or three times and convicted of obstructing a passageway or a highway, which I would submit, viewed in this context with all of this as a background, would be further proof of an individual – would be consistent with an individual who is in the business of selling drugs.

> . . . .

> . . . But with three felony drug convictions, several misdemeanor drug convictions, and then three obstructing a passageway or highway, . . . I think it's a very reasonable inference – and an individual who gets expelled from school in the ninth grade, and his sole employment has been as a dishwasher at a fast food restaurant – I think a reasonable inference is that the majority of his livelihood was from criminal activities; that is selling drugs – involvement in the drug world and the drug business – the sale of drugs. I think a person would be in denial to suggest otherwise. I think it would be naive to suggest otherwise. If a person got arrested and convicted one time for simple possession of marihuana because he was at a concert on Mud Island, that would be one thing. Or if he got arrested for obstructing a highway because he had a flat tire and that was his only arrest, and he was otherwise employed full time at a meaningful employment, that would be one thing. But when you view all of these different things together, the only conclusion I think that is reasonable from all of that is that was the major source of his livelihood, and I'm so finding.

We fully concur with the trial court's view that, based upon the defendant's convictions, it appeared likely that he derived a portion of his income, meager though it apparently was, from the illegal sale of drugs. However, the State did not present proof showing that the defendant had received income from these sales or that he had supported himself with it. In State v. Greg Harris, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, at *20 (Tenn. Crim. App. Feb. 23, 2005), this court set out a number of cases considering application of the consecutive sentencing factor that the defendant was a professional criminal:

> State v. Desirey, 909 S.W.2d 20 (Tenn. Crim. App. 1995) (affirming consecutive sentences based upon proof that the defendant had no other employment and grossed $200,000 per week from his gambling business); State v. Felix M. Leach, No. M2001-02258-CCA-R3-CD, Williamson County (Tenn. Crim. App. Nov. 15, 2002) app. denied (Tenn. March 17, 2003) (concluding that consecutive sentences were proper based on defendant having multiple convictions for drug sales dating back to when he was a juvenile and defendant's admission that his involvement in the drug trade is to provide extra weekly income of $3500); State v. Clifford Leon Farra, No. E2001-02235-CCA-R3-CD, Sullivan County (Tenn. Crim. App. Dec. 10, 2003 .) app. denied (Tenn. May 10, 2004) (concluding consecutive sentencing appropriate based on defendant's tax returns showing income ranging from $0 to $5000 while defendant continued to pay for home mortgage, cars, coins, motor scooters, gun collection, and a lease on a motor home); State v. Frank Michael Vukelich, No. M1999-00618-CCA-R3-CD, Davidson County (Tenn. Crim. App. Sept. 11, 2001) app. denied (Tenn. Apr. 1, 2002) (concluding that evidence established the defendant was a professional criminal when the record indicated the defendant was a major marijuana dealer for several years and used the proceeds to partially finance his legitimate business and purchase a house and a boat).

However, the court also noted that, in cases where the State had not provided that the defendant actually lived on the illegal proceeds, the defendant could not be viewed as a professional criminal, for purposes of consecutive sentencing:

> State v. Paul Anthony Buckner, No. M2003-01743-CCA-R3-CD, Hamilton County (Tenn. Crim. App. Feb. 25, 2004) (holding that despite defendant's numerous convictions of felony sale of drugs, two assaults, criminal trespass, possession of drug paraphernalia, malicious mischief, fraud, possession of a gambling device, three counts of driving on a revoked license, and several motor vehicle violations, the record did not indicate his criminal acts were a major source of his livelihood); State v. Jeffrey Smith, No. E2002-01147-CCA-R3-CD, Hamilton County (Tenn. Crim. App. March 18, 2003) (holding that a defendant was not a professional criminal for purposes of consecutive sentencing when the presentence report indicated only two prior convictions occurring several years beforehand).

Id.

Accordingly, the court in <u>Harris</u> determined that "[b]ecause the state failed to prove that the defendant committed numerous criminal acts or that any criminal acts provided a major source of his livelihood, we conclude that consecutive sentences were unwarranted." <u>Id.</u>

We reach the same conclusion in this matter and remand with instructions that the sentences of defendant Wilkins be served concurrently.

## **<u>CONCLUSION</u>**

Based upon the foregoing authorities and reasoning, we affirm the judgments of conviction of both defendants but modify defendant Wilkins' sentences to reflect that they are to be served concurrently.

_____
ALAN E. GLENN, JUDGE